**STRATOS MOBILE NETWORKS USA, LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Comsat Corporation, Intervenor– Defendant.**

**No. 99–402 C.**

United States Court of Federal Claims.

Sept. 29, 1999.

---

Thomas P. Barletta, Steptoe & Johnson LLP, Washington, D.C., attorney of record for plaintiff. Peter L. Wellington, Paul R. Hurst, and Michael J. Vernick, Steptoe & Johnson LLP, Washington, D.C., of counsel.

Michael S. Dufault, with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, and Assistant Director Harold D. Lester, Jr., Department of Justice, Washington, D.C., for defendant. Amy J. Weisman, Office of Counsel, Department of Navy, of counsel.

David Z. Bodenheimer, Crowell & Moring LLP, Washington, D.C., counsel of record for intervenor. Frederick W. Claybrook, Jr., and John E. McCarthy, Jr., Crowell & Moring LLP, Washington, D.C., attorneys for COMSAT Corporation. John E. Benedict, Senior Counsel, COMSAT Corp., of counsel.

## OPINION

WIESE, Judge.

This is a suit for declaratory and injunctive relief brought under 28 U.S.C. § 1491(b) (West 1994 & Supp.1998). Stratos Mobile Networks USA, LLC ("Stratos") is the disappointed bidder in a competitively negotiated procurement, conducted by the United States Navy, for the acquisition of contractor-provided, leased channel mode, high-speed data satellite communication services. Stratos contends that the award of the contract to COMSAT Corporation ("COMSAT"), the intervenor here, was the result of a flawed proposal evaluation scheme. Specifically, we are asked to set aside the award to COMSAT on the ground that the prescribed determinants for award—the relevance of an offeror's past experience and the competitiveness of its proposed pricing—were assessed by the Navy in a manner contrary to the procurement's stated ground rules.

Resolution of the claim has occasioned two rounds of briefing, each followed by oral argument. The first round, which addressed the merits of the claim, resulted in a bench ruling in plaintiff's favor. The court determined that, because of a latent ambiguity in the solicitation's evaluation criteria, plaintiff was deprived of a fair and proper evaluation of its bid. In the second round, the court took up the question whether, the validation of plaintiff's legal position notwithstanding, the facts of the controversy held out offsetting considerations that counseled against the granting of injunctive relief. On this issue, the court ruled again in plaintiff's favor, and accordingly granted plaintiff's motion for injunctive relief.

In this opinion we explore more fully the facts and reasons that support our earlier rulings, and set forth the terms on which our injunctive power is to be exercised.

## BACKGROUND

On March 1, 1999, the Department of Navy's Space and Naval Warfare Systems Command ("SPAWAR" or "Navy") issued a request for proposals ("RFP") to procure leased channel mode, high-speed, satellite-based, ship-to-ship, ship-to-shore, and shore-to-ship voice, video, and data communication services with 24 hour-a-day, seven day-a-week availability. The RFP required the successful offeror to provide these communication links through the International Maritime Satellite ("INMARSAT") B (Version B) high-speed data service. The award of an indefinite-quantity, indefinite-delivery contract was contemplated.

Included among the numerous provisions of the solicitation was a section titled "Evaluation" (Section V) that informed bidders of the evaluation factors that the Navy would rely on to guide its award decision. In its introductory text, this section advised that the award would be made to the offeror whose proposal met the solicitation's minimum technical requirements and offered the best value to the Navy "in terms of combination of past performance and price." The language cautioned that only those proposals that passed the technical evaluation would be considered for award and it further ex-

plained that "[o]f past performance and price, past performance is more important than price; however, the importance of price will increase with the degree of past performance equality among the proposals." As a final point, the solicitation noted that, in the overall assessment of an offeror's past performance, the Navy would weigh past performance "according to its relevancy to the instant procurement."

Both COMSAT and Stratos satisfied the solicitation's technical requirements, with each contractor receiving ratings of excellent on its technical scores. The award, however, went to COMSAT—a decision based on the Navy's perception that COMSAT's pricing was more flexible and thus more accommodating of the uncertainties of demand associated with an indefinite quantities contract.

Stratos now challenges both aspects of the Navy's evaluation process. It maintains that COMSAT's past performance did not warrant an excellent rating and, further, that the price evaluation analysis conducted by the Navy represented a departure from the format for price evaluation that was called out in the solicitation. We examine these contentions in Section A below, then turn, in Section B, to the issue of fashioning a remedy.

## DISCUSSION

### A

*The Past–Performance Evaluation*

As part of their proposals, the offerors were required to provide information regarding past performance and to identify three former customers that the Navy might contact to obtain an assessment of the quality of the offeror's performance of work (for that customer). The "Past Performance Questionnaire" that the Navy sent to these former customers identified the grading standards to be used, as well as the specific aspects of performance to be considered and, in addition, provided a description of the current procurement that the customers could use as a basis for assessing the degree of similarity between the evaluated program and the current work.

The past-performance histories and the references that the Navy received from the offerors were evaluated by a Technical Evaluation Board and resulted in a finding that both companies had demonstrated excellent past performance on substantially similar work. In the interest of quantifying those findings, the Technical Evaluation Board then prepared a past-performance summary chart that recorded the numerical past-performance evaluations and similarity-of-work ratings each offeror had received and, based on this data, developed a composite score for each of the offerors. It is these composite scores—shown as 4.9 (on a scale of 5.0) for each offeror—that are the focus of Stratos' attack. Stratos maintains that the composite scores were derived from a weighting formula that had the effect of diminishing the higher similarity-of-work ratings it had received (when compared to COMSAT's similarity-of-work ratings), thereby giving COMSAT an undeserved boost on a critical aspect of the past-performance evaluation: the relevance of the contractor's work experience to the tasks required by the subject procurement.

Without getting into specifics, the court agrees, in the main, with Stratos' criticism of the methodology that the Navy adopted in its effort to convert the numerical ratings into a single composite score. Stratos did suffer a "downgrade" in that exercise.

That observation notwithstanding, we must nonetheless reject the proposition that Stratos has identified an issue of decisive importance to the outcome of this procurement. We reach that conclusion because the higher numerical ratings Stratos claims it was denied the competitive advantage of—the "5" ratings on similarity of past work awarded by each of the three members of the Technical Evaluation Board (in contrast to COMSAT's "4" ratings)—are, in fact, much less significant than the difference between these numbers would suggest. The point is explained in a declaration submitted by Stephen V. Keely, the project manager/engineer for the Navy's INMARSAT, Version B, high-speed-data project.

Mr. Keely was responsible for preparing the statement of work contained in the solicitation and served as chairman of the Technical Evaluation Board. Speaking in this latter capacity, Mr. Keely explains (in his declaration):

The result of this [Technical Evaluation Board ("TEB")] review was our recommendation to the Source Selection Official, as recorded in the TEB report, that both companies demonstrated excellent past performance on substantially similar INMARSAT work. Thus, after accounting for similarity, the TEB concluded—before I ever prepared the chart—that, after taking relevancy of the experience into account, there was little difference in the excellent past performance of both competitors. *Stratos' sole advantage in similarity was due to the fact that it had the first contract for INMARSAT–B HSD Leased Channel Mode services with the Navy.* The TEB did not consider this to be sufficient to dismiss the performance [of] the other offeror. (Emphasis added).

As the above-quoted text explains, Stratos' sole advantage in the evaluation of the similarity between its past performance and the instant procurement lay in the fact that it was the contractor that performed the Navy's first contract involving INMARSAT–B–HSD leased channel mode services. It is this distinction, and only this distinction, that the Technical Evaluation Board endeavored to recognize in assigning a "5" rating to Stratos and a "4" rating to COMSAT. Indeed, as Mr. Keely's declaration makes clear, the recognition of this difference through the assignment of different numerical ratings was not meant to say—contrary to the argument Stratos raises here—that Stratos' past experience was 20 percent more relevant (*i.e.*, 20 percent more similar) than COMSAT's. To the contrary, as noted elsewhere in Mr. Keely's declaration, "[b]oth offerors evidenced significant experience in providing INMARSAT services"; hence, his earlier-quoted conclusion: "there was little difference in the excellent past performance of both competitors."

On the basis of Mr. Keely's declaration, the court must reject the contention that Stratos was denied the evaluative benefit of a superior past-performance record and rating.

*The Price Evaluation*

█ Stratos' second objection is based on its contention that the Navy conducted a price evaluation that departed from the basis for evaluation called out in the solicitation, thereby depriving it not only of a fair opportunity to compete, but also of recognition as the solicitation's legitimate low bidder. It argues that the Navy improperly rejected the lowest bid (when tested against the solicitation's anticipated order amounts) in favor of a bid that revealed itself as a better value only when examined in light of quantities different from those set forth in the solicitation. Stratos contends that neither the language of the solicitation nor the procedures essential to the conduct of a fair and effective competition permit the Navy to announce one standard for price evaluation, but then decide by another. It is the anticipated order amounts, and those only, that Stratos maintains must guide the Navy's award decision.

Stratos' argument begins with Section V of the solicitation, titled "Evaluation." That section provided in part:

*Price* will be evaluated using the anticipated order amounts which follow. Offerors are cautioned that the evaluation quantities are approximations of, and therefore *do not exactly match* the quantities set forth on Attachment (2) to the Statement of Work.

Immediately following the quoted paragraph was a list of "anticipated order amounts." These were listed in chronological order (covering the full five years of the contract's expected life) and were stated in terms of quantity (the number of INMARSAT channels being ordered), starting time (the particular month the service is to begin), and duration (the number of months the service is to remain in place). (To give an example, the first anticipated order amount read as follows: "20 channels, each for a four month period beginning in July 1999.")

As to the pricing of this work, the solicitation directed bidders to submit an undiscounted unit price per channel/per month, and it went on, in a section headed "Discount(s) Applicable to CLIN [Contract Line Item Number] 0001 [the anticipated order amounts]" to instruct that "Offerors may of-

fer discount(s) of their choice. Offerors are not required to offer discount(s)."

In the preparation of their bids, both COMSAT and Stratos included discounts as part of their pricing. These discounts, however, were structured differently. In general terms, Stratos' per-unit price discounts would become available only after the Navy had built up a specified channel-month ordering total, found by multiplying the number of channels ordered by the months in service. In order to receive credit toward these cumulative totals, the Navy was required to place orders each month for a number of channels that matched or exceeded the number of channels specified for that month in the solicitation's anticipated order quantities. A failure to order the prescribed minimum quantity in the specified month resulted in the resetting of the cumulative channel months to zero and thus caused a delay in reaching the channel-month level necessary for discount. Stratos' discount, in other words, was tied to an exact replay of the solicitation's anticipated order amounts. In contrast, COMSAT, following an example set forth in the solicitation, offered a discount for any channel quantity when ordered for a 12-month period. COMSAT's discount thus depended only on the duration of an order, and operated without regard to the number of channels ordered, or to the month of an order's placement.

In its evaluation of each offeror's final proposed pricing, the Navy began by applying the quoted per-channel prices, including proposed discounts, to the evaluation quantities listed in the solicitation. In this comparison, Stratos came out as the low bidder. Stratos' price was $64,221,920; COMSAT's, $65,254,030.

However, the Navy did not stop the price evaluation process at this point. Rather, it went on to test the implications of the offeror's pricing against quantities and durations different from those set forth in the anticipated ordering quantities. And, when so evaluated, COMSAT's pricing became the decisive choice because it was more accommodating of the uncertainties inherent in the

Navy's demand. The Technical Evaluation Board summed up its views this way:

- COMSAT's monthly undiscounted per channel price is $3,350 lower than Stratos'.
- Stratos' lower overall evaluated quantity price is *entirely* dependent upon the Government ordering channels in the *same* months and in the *same* quantities as were used for the evaluated quantity. COMSAT's discounts are not directly tied to the Government placing orders in the same manner as the orders used for price evaluation.
- The communications requirements of the U.S. Navy are subject to fluctuation due to the very nature of its mission to rapidly respond to world events which cannot be predicted. Stratos' pricing, as illustrated by several examples contained herein, is only lower under *very limited conditions which place restrictions that are so arduous that the* pricing offered by Stratos for the evaluation quantity is likely to never materialize due to the discount terms.
- COMSAT's evaluated quantity pricing, although somewhat higher than Stratos' evaluated quantity pricing, is more advantageous to the Government. COMSAT's discount terms are more advantageous to the Government because they are not tied to a requirement to have a specific number of leases in place in a specific months.

Viewed in light of the price evaluation clause—"[p]rice will be evaluated using the anticipated order amounts which follow"— the Technical Evaluation Board's price analysis seems quite plainly to reach beyond the evaluation standard announced in the solicitation. Indeed, taken at face value, there is little room in the language of the price evaluation clause to argue that the Navy retained discretion to conduct a price evaluation that focused on anticipated order amounts different from those listed in the solicitation.

Insistence upon a literal application of the price evaluation clause, however, is complicated by other seemingly contradictory aspects of the solicitation. Defendant points out, for example, that the anticipated order amounts were identified simply as approximations of the expected ordering level, and further notes that the solicitation cautioned bidders that "evaluation of the above quantities [the anticipated order amounts] does *NOT* obligate the Government to place orders in that manner." These cautionary signals, defendant asserts, demonstrate that plaintiff's strict adherence to the evaluation quantities in the construct of its discount formula was not justified. While we do not find that argument dispositive—failing as it does to distinguish between the admittedly uncertain order amounts that ultimately may be required under an indefinite quantities contract and the specific order amounts set forth for the purpose of price evaluation—we nonetheless agree that the solicitation's language, at times, could call plaintiff's literal interpretation into question.

One of the sections most difficult to reconcile with the price evaluation language is the solicitation's references to discounts. As an aid to bidders, the solicitation provided several examples showing how a discount might be structured. One of these examples read as follows:

2. A___*___% discount applies to the above unit price if

- Channel(s) are ordered for 12 months at a time and
- At the time of the order, funds are provided for the entire period ordered

  This discount is WITHOUT REGARD to the number of channels ordered.

With regard to the evaluation of discounts, the solicitation further informed bidders that "[i]n the price evaluation, the Government will apply any discounts offered as applicable...." Offerors were additionally reminded that, in calculating their total evaluated price dollar amount, they should "apply any and all discounts ... that are applicable to the evaluation quantities."

Given this language—specifically, the instruction that the discount applies "WITHOUT REGARD to the number of channels ordered"—a discerning bidder might have been prompted to ask how the Navy, in conducting its price evaluation, could expect to limit the scope of its inquiry to the solicita-

tion's estimated quantities, yet at the same time assess the economic value of any discount formula that was structured to yield a price advantage to the Navy completely without regard to estimated quantities. That apparent inconsistency alone could have signaled the Navy's intent to employ an analytical approach that extended beyond mere consideration of the evaluation quantities.

In addition, the Navy's behavior might itself have caused an offeror to question its understanding that the bids would be evaluated against only the stated criteria. For example, while the negotiation process was still underway, the Navy undertook a preliminary examination of the offerors' interim proposals that led, in turn, to letters to the offerors seeking their clarification on certain aspects of the proposals. In particular, as to Stratos' pricing, the Navy wrote to Stratos on May 4, 1999, saying:

> [I]t appears that the discounts you are offering in your 21 April 1999 revised proposal apply to the exact anticipated quantities included in the RFP for price evaluation. Although the price evaluation quantities constitute a reasonable estimate of future order quantities, it is impossible to predict exact order quantities over the five-year ordering period. Accordingly, the RFP advised that evaluation of the anticipated order amounts would not obligate the Government to place orders in that manner. Consequently, we are seeking confirmation/clarification with regard to the discounts you have offered in your 21 April 1999 proposal revision.

The Navy's letter then went on to pose a series of questions each of which focused on the application of Stratos' discount formula to ordering quantities or ordering periods different from the anticipated ordering quantities enumerated in the solicitation. The questions read as follows:

> 1. Are we correct in concluding that we would not get a discount if we order additional service to be provided in a month not specified in the price evaluation quantities? For example, if we were to order 21 channels, each for a twelve month period beginning in October 2000 with funding provided for the entire twelve-month period instead of the 20 channels, each for a twelve month period beginning in October 2000 with funding provided for the entire twelve-month period specified as a price evaluation quantity in the RFP, are we correct in concluding that we would not get the discount for the 21st channel in any month of the 12-month period?

> 2. What discounts would apply if we ordered 20 channels, each for a twelve month period beginning in November 2000 with funding provided for the entire twelve-month period instead of the 20 channels, each for a twelve month period beginning in October 2000 with funding provided for the entire twelve-month period specified as a price evaluation quantity in the RFP? Also, how would that affect the completed lease-month total?

> 3. We have concluded, for example, that if 521 lease months are completed in June 2000, that we would get no volume discount for the 101 lease months in excess of the 420 completed lease months that completed in June. The discount would not apply until July 2000 and would not be retroactive to any of the June channels. Is our conclusion correct?

> 4. What discounts would apply if we ordered 30 channels, each for a six month period beginning in November 2000 and 30 channels, each for a six month period beginning in May 2001 instead of ordering 30 channels, each for a twelve month period beginning in November 2000 with funding obligated incrementally in approximate intervals of three months? Also, how would that affect the completed lease-month total?

> 5. Are the discounts independent of the specific month in which orders are placed? For example, if we ordered 15 channels, each for a nine month period beginning in January 2002, and placed that order in October 2001 or November 2001 or December 2001 or January 2002 would we get the benefit of the discount, or is the discount also tied to the month in which we order the service? If so, in which month would we have to order the foregoing service to get the discount?

Notwithstanding the foregoing questions, Stratos' final price proposal, submitted on May 12, 1999, retained the same basic discount plan that had prompted those questions in the first place.

By way of explaining this adherence to the same price discount structure, Stratos maintains that it was prompted to do so on the basis of the Navy's early assurances that the evaluation quantities were to provide the basis for price evaluation. Stratos claims that, during its oral presentation to the Navy on April 7, 1999, it directly inquired about the basis on which price would be evaluated for purposes of the award determination, specifically, whether the award would be based on the undiscounted unit price per channel per month, on the undiscounted price for the contract's maximum order amount (4,500 channel-months), or on the anticipated order amounts. According to the declarations of Stratos' president, Derrick Rowe, and its vice-president, Wayne D'Ambrosio, "the Navy's representatives repeatedly emphasized that price would be evaluated for award based on the total price resulting from the application of the offerors' proposed discounts to the anticipated order amounts set forth in the price evaluation model in Section V of the RFP."

Moreover, as to the questions raised in the Navy's letter of May 4, Mr. D'Ambrosio's declaration goes on to state:

We ... did not understand the Navy's May 4 letter as indicating that price might be evaluated on the basis of other calculations, analyses or factors such as those subsequently set forth [by the Technical Evaluation Board].

And, he adds:

At no point during the telephone discussions between May 10 and 11 [discussions between Stratos and the Navy directed to drafts of Stratos' proposed responses to the Navy's inquiry of May 4], did the CO [contracting officer] tell us that the result of the price evaluation based on the anticipated order quantities in Section V of the RFP would be offset or outweighed by other calculations, analyses or factors, such as those set forth [by the Technical Evaluation Board].

Based on all of the foregoing, the question we are left with is this: Was it reasonable for Stratos to assume that the Navy would confine its price evaluation to the anticipated order quantities even where a bidder chose to adopt the Navy's discount model and thus offer a discount that would apply without regard to *any* specified order quantities?

From the standpoint of the solicitation's language, the answer, as we already have suggested, might readily be no. Certainly the Navy's expressed intention to conduct a price evaluation "using the anticipated order amounts" would have to be questioned given the Navy's simultaneous assurance that it would "apply any discounts offered as applicable." Accorded their full reach, these statements become contradictory: The Navy cannot honor both at the same time.

Thus, it would be easy enough now to say that Stratos should have spotted this potential problem and sought its clarification. Clearly, however, it did not; it never presented the issue to the Navy. But, if we are to say that the problem stood out clearly enough for Stratos to see, then surely the same must be said of the Navy given, in particular, the questions it raised about the unique sensitivity of Stratos' pricing to the anticipated order quantities and the veiled words of caution it expressed to Stratos concerning the significance of those estimated quantities.

The fact that neither Stratos nor the Navy raised the issue—although it clearly would have been in their respective interests to do so—convinces the court that what we are dealing with here is a latent ambiguity in the language of the solicitation. Plainly put, Stratos never read the solicitation's words as expansively as the Navy intended them to be read; the Navy, in turn, never saw its words to be as limiting as Stratos took them to be. In short, the solicitation harbored a defect in language that resulted in the submission of two offers each premised on a different view of how the Navy intended to proceed with the matter of price evaluation, and that prevented the Navy, as a consequence, from conducting a fair and effective competition.

Recognition of that defect, however, does not lead us inevitably to an injunctive remedy. Plaintiff's success on the merits—though a significant consideration—is not the only factor to be weighed in determining whether an injunction should issue. Accordingly, we turn now to an assessment of the various interests at stake—Stratos', COMSAT's and the Navy's—and the effect on those interests if injunctive relief were to be granted.

**B**

■ In attempting to fashion appropriate relief, we begin by noting that an injunction is an extraordinary remedy—one that extends not merely to the purse but to the person. To validate the award of such relief, a litigant must show not only that it is without an adequate remedy at law (*i.e.*, that its injury is not monetarily redressable), but also that the issuance of an injunction will not engender greater harm than it endeavors to relieve. "[I]t is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all—including the public—whose interests the injunction may affect." *Inland Steel Co. v. United States*, 306 U.S. 153, 157, 59 S.Ct. 415, 83 L.Ed. 557 (1939).

■ There is no dispute here that plaintiff lacks an adequate remedy at law. Public contract law does not allow a disappointed bidder to be compensated for the loss of opportunity that is occasioned by an improperly rejected bid. All that Stratos could expect to recover are its bid preparation and proposal costs. Similarly, there is no dispute that the interests of the national defense dictate that the Navy be assured of continuous, uninterrupted access to the INMARSAT–B high speed data communications services pending any reprocurement or repricing of the contract services under a corrected solicitation.

■ With these considerations in mind, Stratos asks the court to issue an injunction directing the Navy to rewrite and clarify the evaluation criteria and then to conduct another round of final pricing between Stratos and COMSAT to determine a low bidder. Additionally, to assure the Navy that communication services continue without interruption, Stratos proposes that COMSAT remain in place as the incumbent contractor until such time as a new low bidder may be determined. And, should the reaward of the contract go in Stratos' favor, Stratos maintains that the transition from one provider to another (from COMSAT to Stratos) can be managed with minimum disruption to the Navy's interests.

■ The question of whether Stratos has put forward a viable solution for the granting of injunctive relief requires us to examine the benefits and harms to the various interests involved. Specifically, we must determine whether the benefit of granting injunctive relief to Stratos outweighs any harm to COMSAT and the Navy that that relief might precipitate.

In assessing the relative burdens that the grant or the denial of injunctive relief would impose, we start by noting that eligibility for participation as a bidder in the Navy's procurement of INMARSAT–B satellite communication services required a substantial investment in transmission facilities and equipment, either owned or leased. Stratos places its investment costs in such facilities and equipment at approximately $7.5 million. Thus, the denial of an injunction would inflict upon Stratos not only the harm that unfair exclusion from the competitive process normally entails—namely, the denial of the opportunity to earn future profits—but also would prevent it from having any hope of recovering its investment costs under the contract. And, as there is little reason to assume, given the record before the court, that replacement business could readily be found to help Stratos recoup its investment, the result would be to translate a reasonable business risk into a permanent business loss.

By contrast, COMSAT's "up-front" costs were substantially lower than Stratos'—roughly $900,000. However, COMSAT faces a risk of loss as large as Stratos' because, after contract award, COMSAT finalized subcontract arrangements providing for the use and operation of the necessary transmission facilities and equipment which, if prematurely terminated, would expose COMSAT to a multi-million dollar termination liability. COMSAT places this number at approxi-

mately $9.5 million. In COMSAT's case then, an injunction not only opens up the possibility of its being displaced by Stratos as the Navy's contractor, but also of being confronted with subcontractor termination claims of substantial dollar magnitude.

The economic dislocations associated with an injunctive remedy, whether that remedy is to be granted or denied, are thus enormous in either case. The point bears repeating, however, that should we decide in Stratos' favor, COMSAT's loss is a conditional one—arising only if COMSAT fails to win the reaward. Stratos' injury, on the other hand, would, in the absence of an injunction, become a certainty.

Notwithstanding the qualitative differences between these risks, however, we see the respective hardships that would be visited upon the parties as essentially equal. As a result, the balancing of these hardships provides us no clear guidance as to the appropriateness of granting injunctive relief. We must therefore look to the final—and in our view most significant—consideration at stake: the public interest.

Of the various public interest concerns raised in this litigation, paramount, quite clearly, is the issue of national defense. Indeed, this court's jurisdictional statute admonishes us that "[i]n exercising jurisdiction under this subsection, the court shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C.A. § 1491(b)(3) (West 1994 & Supp. 1999). The Navy has outlined a number of national defense concerns relating to the issuance of an injunction, ranging from an exhaustion of available funds to the deployment of a fleet lacking comprehensive satellite-communication capability. We address these risks in turn.

The first, and in our estimation, gravest threat an injunction may pose to national security is the risk that during a period of resolicitation, the remaining INMARSAT channel leases will be acquired by outside parties, leaving the winner of the repriced procurement—COMSAT or Stratos—unable to provide the Navy with the satellite communications capacity it requires. The inter-

ests of national security, we believe, dictate that the Navy have guaranteed access to the requisite number of communication channels, thus requiring us to fashion a remedy—if any—that fully accounts for and protects the Navy's needs.

In an effort to address the court's concern, Stratos offered to maintain a first right of refusal ("FRR") reservation with INMARSAT—a mechanism, it contends, that would give it priority in purchasing unleased channels and thereby ensure that the Navy's requirements could later be met. That suggestion proved controversial, however, as the parties expressed fundamental disagreement as to the scope and effect of the FRR process.

In order to understand the nature of that dispute, the court turned first to the reservation policy itself. INMARSAT provides its customers with two methods of reserving satellite space: the guaranteed reservation and the first right of refusal reservation.

Under INMARSAT's Land Earth Station Operator Agreement ("the Agreement"), a guaranteed reservation is one in which INMARSAT commits itself to make the required capability available to the reserving applicant, who in turn commits itself to take and pay for the required capacity. Both in theory and practice, the concept is simple: A guaranteed reservation is an order that locks INMARSAT and the contractor into a deal for a certain number of channels over a certain period of time.

INMARSAT's payment requirements for a guaranteed reservation typically include an initial $100,000 deposit, annual payments at the beginning of each new year of service (including one year's payment at the beginning of the contract), and 50 percent termination liability for whatever lease period remains outstanding on the contract should the contractor terminate.

The first right of refusal reservation, in contrast, is more complicated. By paying a $100,000 deposit, a potential contractor can reserve with INMARSAT a block of one or more satellite channels for a certain time period. If that FRR reservation is "challenged," i.e., if another customer later wishes

to place a guaranteed reservation for that block that exceeds the remaining channel capacity available on a particular satellite, INMARSAT notifies the FRR holder, who within 30 days must either place a guaranteed reservation for or surrender the challenged satellite space. If the reservation is surrendered, INMARSAT will return the $100,000 deposit to the challenged party. A guaranteed reservation request will be considered a challenge only if that request is "for a guaranteed reservation which can only be approved by assigning capacity which is already subject to a first right of refusal reservation."

According to the Agreement, if the FRR is not challenged, the FRR holder is not faced with the decision whether to guarantee or cancel the reservation until approximately six weeks before the beginning of the period covered by the FRR. Specifically, 30 working days before commencement of the reserved period, the FRR reservation becomes a guaranteed reservation unless the FRR holder elects to cancel it.

Despite the clarity of INMARSAT's leasing agreement, however, the court soon discovered that the administrative enforcement of those policies more reflected business realities than it did the literal language of the Agreement. Thus, where the Agreement specified that an FRR would either be converted into a guaranteed reservation or canceled 30 days before the reservation was scheduled to take effect, INMARSAT's actual policy—both as applied in the past and as projected for the future—proved more flexible. Similarly, the documentation listed in the Agreement as a prerequisite to a valid FRR was, in practice, not required.

Those discrepancies—though limited to procedural rather than substantive variations and enforced equally against all customers—engendered much confusion among the parties about the mechanics of INMARSAT's reservation system. Because of the indispensability of the FRR reservation in protecting the Navy's channel access needs, the court thus determined to seek its answers directly from the source: INMARSAT itself.

After several hearings, numerous supplemental filings, and an extremely informative in-court transatlantic telephone conference with INMARSAT's general counsel and other INMARSAT officials, the court concluded that the judicious use of FRR reservations would indeed ensure the Navy access to satellite channels equal to or greater than it presently enjoys under its contract with COMSAT. By requiring, as we do in the attached order, that Stratos maintain an FRR reservation for 75 channels and that it guarantee those channels should a challenge be made, we thereby assure the availability of the channels requested in the Navy's original contract.

Satisfied, then, that an injunction will not jeopardize the Navy's ability to secure long-term access to its required number of satellite channels, we turn briefly to the other concerns expressed by the Navy in the name of the public interest. Chief among these concerns is the potential disruption to service associated with the transition from one contractor to another, a double threat, the Navy points out, if Stratos should win the contract award but COMSAT should prove successful on appeal. The Navy, having already experienced technical and operational difficulties in its earlier transition to COMSAT, hopes to prevent any loss in service, as well as avoid the personnel costs—the need for additional training and the risk of decreased morale—such a transition might bring.

The Navy's concern is not an insignificant one. Just as the court sought to ensure that the Navy would have available to it the required number of channels during and after a recompetition, so too do we recognize the need for continued and uninterrupted satellite service throughout the period of transition. We note, however, that a reprocurement poses transition risks no greater than those faced under the original contract, and the Navy's earlier experience substituting one contractor for another will undoubtedly prove helpful should it be required to do so again. The fact that Stratos was the incumbent contractor under the predecessor contract increases the likelihood that any transition can be accomplished with minimal or no disruption to the Navy's interests. And any inconvenience that may result from a subse-

quent transition must be viewed, ultimately, as a price of the Navy's original error.

Yet while the interests of equity may require the Navy to reverse its course once, neither economy nor efficiency would dictate that it should be made to undertake a transition twice—first if Stratos should be chosen on reaward and second if COMSAT should prevail on appeal. In an effort to minimize any disruption to the Navy, we have thus attempted to fashion a remedy that takes into account the uncertainties of the contract award and appellate processes by envisioning at most a single transition: January 1, 2001. The details of that proposed transition are discussed in the injunction terms set forth below. That safeguard, we believe, adequately protects the Navy from undue disruption, while at the same time ensuring that the contract will be assumed—or resumed—by the contractor fairly chosen in a defect-free procurement.

Finally, we dispose of the Navy's remaining concerns in short dispatch. The Navy's objection that it will be unable to take advantage of COMSAT's annual and volume discounts during the period of recompetition in no way mitigates the need for injunctive relief. Even were the Navy to face increased costs as a result of the recompetition—an assertion we are unconvinced will be borne out by the facts—additional costs are a customary consequence of the exercise of a court's injunctive power. And while we are sensitive to the military's budgetary constraints, the court cannot include these lost discounts as important criteria in determining the appropriateness of an injunction. If the contract was improperly awarded in the first place, as the court believes it was, then the Navy should not be entitled to claim the benefits that that contract alone will provide.

Similarly, the Navy's concern that a delay in the ultimate contract award will inhibit technological innovation under the present contract affords this court no basis for denying injunctive relief. There is no reason to believe, as an initial matter, that the 15 months in which COMSAT will provide the Navy's satellite services in compliance with the attached terms of injunction will be a period insufficient to inspire technological innovation, or that such progress will not also be made during the remaining term of the contract. More importantly, however, the Navy cannot expect to receive the advantages of a contract whose award, by its own actions, did not meet fundamental standards of fairness.

## CONCLUSION

Based on the foregoing concerns, the court concludes that the Navy's solicitation of Contract No. N00039–99–D–3201 was improperly conducted and must therefore be set aside. The court is further convinced that neither a balancing of the hardships to the parties nor an assessment of the public interest weigh against the granting of injunctive relief. Accordingly, we grant plaintiff's motion for an injunction, and specify the terms of the injunction in the attached declaratory order.

## ORDER

1. The United States Navy is hereby ordered to rewrite, for clarification, the price evaluation criteria applicable to Solicitation N00039–99–R–3201(Q) and to conduct and conclude by January 28, 2000 a second round of final price evaluations between Stratos Mobile Networks USA, LLC ("Stratos") and COMSAT Corporation ("COMSAT") pursuant to such revised price evaluation criteria.

2. If, as a result of the recompetition, the award is made to Stratos, the Navy shall conduct an orderly transition from one contractor to another. The transition shall not occur, however, nor shall performance under the new contract begin, until January 1, 2001. Upon the beginning of such performance by Stratos, COMSAT's existing contract shall be terminated for convenience.

3. National security concerns dictate that COMSAT be retained as the incumbent contractor until January 1, 2001 in order to minimize both the additional program costs and the possible technical difficulties that the Navy could expect to encounter during a transition

from one contractor to another. (The court assumes the January 1, 2001 date to represent an "outside" date for the determination of an appeal in this matter.)

4. (a) Stratos is hereby ordered immediately to secure a First Right of Refusal ("FRR") reservation for 75 channels on INMARSAT's lease-dedicated satellites that shall cover the period from January 1, 2001 to June 30, 2004, or guaranteed reservations covering such period to the extent necessitated by any challenge to the FRR.

(b) If prior to the date of award determination (January 28, 2000), Stratos relinquishes its FRR in response to a challenge, the injunctive order will dissolve.

(c) Stratos shall not use the FRR to interfere with COMSAT's acquisition of channels for the Navy's use pursuant to any delivery order issued under a replacement to Contract 00039, and Stratos shall waive and relinquish its rights under the FRR to the extent necessary to allow COMSAT to obtain leases for such use if COMSAT provides Stratos with advance written notice of its application for a guaranteed reservation with INMARSAT, accompanied by a copy of the delivery order.

(d) If the recompetition results in an award to COMSAT and COMSAT makes a written request within seven days after such award, Stratos is hereby ordered to transfer to COMSAT, to the fullest extent permitted by INMARSAT, Stratos' FRR and/or any guaranteed reservations placed by Stratos pursuant to Paragraph 4(a) of this order. If the FRR is transferred, COMSAT shall pay Stratos $100,000. If any guaranteed reservation is transferred, COMSAT shall pay Stratos an amount equal to that which would be payable to INMARSAT for such guaranteed reservation under INMARSAT's applicable price schedule (including volume and annual discounts) as set forth in the INMARSAT Land Earth Station Operators Agreement Annex G, § B.4.2 and the INMARSAT Lease Network Pricing Principles.

(e) Between the time Stratos obtains its FRR and the date of award determination (January 28, 2000), COMSAT is hereby ordered to refrain from directly or indirectly challenging Stratos' FRR on behalf of any customer other than the Navy. COMSAT shall not permit any land earth station ("LES") operator directly or indirectly controlled by COMSAT to be used by any entity seeking to challenge Stratos' FRR. Within ten days of the date of this Order, COMSAT shall provide this court and the parties with written confirmation that its LES subcontractor Telecom Italia and its subsidiaries have agreed to this same limitation on challenges to Stratos for customers other than the Navy. If this provision poses a business hardship to COMSAT with respect to its other commercial dealings, COMSAT may appeal to this court for reconsideration of this requirement.

5. The Navy is further ordered to disclose to COMSAT information regarding Stratos' proposed price and technical approach comparable to the COMSAT information which has been publicly disclosed in Contract 0039 and in COMSAT's June 8, 1999 Application to the FCC to provide INMARSAT–B leased channel mode service to the Navy. In particular, the Navy shall disclose Stratos' undiscounted CLIN 0001 unit price, CLIN 0001 discounts and CLIN 0003 unit price from Stratos' May 13, 1999 Final Proposal Revisions, and the owners and locations of each LES which Stratos proposed to use in performing Contract 00039.